<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>                    v.<br><br>GUY GENTILE,<br><br>                              Defendant. | Case No. 2:16-cv-1619 (BRM) (JAD)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss filed by Defendant Guy Gentile ("Defendant"), seeking to dismiss the Amended Complaint of Plaintiff the Securities and Exchange Commission ("SEC" or "Commission" or "Plaintiff"). (ECF No. 81.) Plaintiff opposed Defendant's Motion (ECF No. 84), and Defendant replied (ECF No. 89). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion to Dismiss is **GRANTED**.

I.   **BACKGROUND**

   A.   **Factual Background[1]**

The Amended Complaint alleges Defendant perpetrated two penny stock[2] manipulation schemes. (ECF No. 47 ¶ 1.) The first scheme, involved Raven Gold Corporation ("RVNG"), "a purported gold and silver exploration company," and is alleged to have been perpetrated during 2007 (the "RVNG Scheme"). (*Id.*) The second scheme "involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a company involved in natural gas production," and is alleged to have been perpetrated between 2007 and 2008. (*Id.*)

   1.   **The RVNG Scheme**

RVNG was a Nevada corporation formed in or about February 2005 that "claimed [] it was in the business of mineral exploration" but in fact "was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies." (*Id.* ¶ 17.) In or around April 2015, RVNG "conducted two unregistered offerings of a total of 7.424 million shares of its common stock," however the individuals who received the stock "were nominees of the attorney who had created the shell, and not true owners of the stock." (*Id.* ¶ 18.) "Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the . . . shell from the attorney who created it." (*Id.* ¶¶ 19–20.) "[T]o effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees" including Defendant, Mike Taxon, and Itamar Cohen. (*Id.*

---

[1] For the purpose of this motion to dismiss, the Court accepts the factual allegations of the Amended Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[2] "Penny stocks are low-priced, high-risk equity securities for which there is frequently no well-developed market." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 175 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (quotation omitted).

¶ 20.) "These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer—first, the attorney who had created the shell and then the RVNG Owners—directed all transfers." (*Id.*) In August 2006, RVNG carried out a 5:1 stock split and announced in September 2006 it "had decided to discontinue mineral exploration at its British Columbia property." (*Id.* ¶ 21 (internal quotation omitted).) In or around March 2007, RVNG executed a further 2:1 stock split. (*Id.*) During the relevant time period, RVNG "had approximately 75 million shares of common stock issued and outstanding, of which 34 million shares were traceable to [previous offerings] and purportedly covered by the subsequent resale registration statement, the goal of which was to make the shares appear unrestricted." (*Id.* ¶ 22.) During the relevant time period, the RVNG Owners "had complete control of RVNG and its management." (*Id.* ¶ 24.)

In or around early 2007, "the RVNG Owners met Taxon and Cohen . . . and proposed that Taxon and Cohen promote RVNG stock." (*Id.* ¶ 25.) Taxon and Cohen subsequently reached out to Defendant and invited him to participate. (*Id.*) Ultimately, the RVNG Owners "agreed to give Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock promotion campaign." (*Id.* ¶ 26.) The campaign consisted of "a promotional mailing, other advertising, and manipulative trading that would create the false impression of liquidity and active interest in the stock." (*Id.*) Taxon and Cohen "agreed that [Defendant] would help them execute the key aspects of the promotion" and in return he would receive a portion of Taxon and Cohen's cut of the stock. (*Id.*) Additionally, the three men agreed "they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign." (*Id.*)

Between mid-May through mid-June 2007, the RVNG Owners "directed transfers of eighty percent of RVNG's purportedly unrestricted stock . . . to accounts controlled by [Defendant],

3

Taxon, and Cohen." (*Id.* ¶ 27.) Of the transferred shares, roughly seven million shares were placed in an offshore account under Taxon's control. (*Id.*) This was a negotiated term of the deal "to ensure that the RVNG Owners would not sell large quantities of RVNG stock behind [Defendant], Taxon[,] and Cohen's backs, and thus undermine [Defendant], Taxon[,] and Cohen's efforts to drive up the stock price and sell shares at a high price." (*Id.*) In order to obscure their connection to RVNG, Defendant, Taxon, and Cohen deposited blocks of shares in "U.S. brokerage accounts held in the names of several offshore brokerage firms" where the three men had or controlled accounts. (*Id.* ¶ 28.)

In or around June and July 2007, Defendant and Taxon "directed manipulative trades in RVNG stock." (*Id.* ¶ 30.) These trades were executed to (1) "generate cash to fund the promotional mailing and advertising" campaign; and (2) "to create the false appearance of liquidity and active interest in the stock." (*Id.*) Defendant and Taxon made trades between their various accounts which created "an attractive (but fake) price and volume history" that could be used to entice investors in the upcoming promotions. (*Id.*) Defendant, Taxon, and Cohen also "reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market purchases of RVNG stock." (*Id.* ¶ 31.) In total, these acquaintances bought approximately 101,500 shares of RVNG stock and, through the kick-backs, made a profit of approximately $25,600. (*Id.*)

The "centerpiece" of the RVNG promotional campaign was "an eight-page glossy 'newsletter' touting RVNG stock . . . [published] under a fake entity name, 'Stock Trend Report'" (the "RVNG Mailer"). (*Id.* ¶ 32.) Defendant, Taxon, and Cohen collaborated in the creation and distribution of the RVNG Mailer in mid-July 2007. (*Id.* ¶¶ 32, 44.) The RVNG Mailer "contained multiple materially false or misleading statements" and purported to be a July 2017 "Special

Edition of Premium Members" when, in reality, there had been no prior and were no subsequent published editions of the "Stock Trend Report." (*Id.* ¶ 33.) The RVNG Mailer touted that RVNG stock had been "seen on" many major news publications, however its appearance in those publications was solely based on paid advertisements placed by Defendant, Taxon, and Cohen. (*Id.* ¶ 34.) The RVNG Mailer also touted the stock's strong performance which it attributed to RVNG's strong business prospects. (*Id.* ¶ 36.) The RVNG Mailer failed to disclose that "a substantial portion" of the stock's trading activity was the result of trades executed by "[Defendant], Taxon, and those acting in concert with them," which were executed to create the appearance of an attractive price and trading history and were not the result of legitimate market interest. (*Id.*) Despite there being a lack of true market demand for RVNG stock, the RVNG Mailer included a notice that read, "Please note: Due to the high market demand for RVNG by institutional investors, some brokers may require you to phone in your order." (*Id.* ¶ 37.)

The RVNG Mailer also contained a disclaimer that was, itself, materially false and misleading, and failed to disclose "the compensation received by the [M]ailer's publisher and the publisher's motivations and intentions with respect to the stock." (*Id.* ¶ 38.) The disclaimer further stated RVNG had "not approved the statements made in this opinion" even though the RVNG Owners "had seen drafts of the mailer and had signed off on its content." (*Id.* ¶ 40.) The disclaimer's statements relating to Stock Trend Report were also misleading because Stock Trend Report was "a nonexistent, fictional enterprise." (*Id.* ¶ 42.) In July 2017, Defendant, Taxon, and Cohen placed paid advertisements in several major publications that contained many of the same materially false and misleading statements as the RVNG Mailer. (*Id.* ¶ 43.)

During this same period, the "RVNG Owners supported the stock promotion campaign with a steady stream of RVNG press releases." (*Id.* ¶ 45.) In total, RVNG issued thirteen press

releases discussing "purported arrivals of new officers and directors" and "purported developments in RVNG's exploration business." (*Id.* ¶ 46.) Defendant, Taxon, Cohen, and the RVNG Owners "coordinated the timing and number of these press releases" with the intention of supporting the "ongoing market manipulation scheme" being carried out by Defendant, Taxon, and Cohen. (*Id.*)

The SEC alleges the RVNG Scheme was successful. Prior to May 31, 2007, "RVNG traded at prices not exceeding $0.80 per share and with minimal volume, with no trading occurring on many days." (*Id.* ¶ 47.) Following the initiation of the promotional campaign, the price and volume increased dramatically and subsequently receded upon completion of the promotion. (*Id.*)[3] "Because [Defendant], Taxon[,] and Cohen obtained RVNG stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act. . . . [however,] no registration statement was filed . . . with respect to their sales of RVNG stock." (*Id.* ¶ 48.) In total, "[t]he selling of unregistered RVNG stock by [Defendant], Taxon[,] and Cohen generated an estimated five million dollars in gross proceeds." (*Id.* ¶ 49.)

### 2.    The KYUS Scheme

KYUS was a Delaware corporation formed in or about September 2006 that "claimed that its 'principal business plan was to acquire, explore[,] and develop mineral properties and to

---

[3] Plaintiffs provide the following chart to illustrate their point:

| Time Period | Average Daily Volume | Daily Closing Price–Low | Daily Closing Price–High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07 | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

(ECF No. 47 ¶ 47.)

6

ultimately seek earnings by exploiting the mineral claims.'" (*Id.* ¶ 50.) However, KYUS was "a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives" (the "KYUS Shell Sellers"). (*Id.*)

In or about March 2007, KYUS filed a registration statement "covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000." (*Id.* ¶ 51.) The one million shares were sold to friends and acquaintances of the KYUS Shell Sellers, however these individuals were "mere nominees of the KYUS Shell Sellers." (*Id.*) Instead, the KYUS Shell Sellers maintained control over the shares during the relevant time period. (*Id.*) "After the purported public offering, [KYUS] had three million common shares issued and outstanding: two million restricted shares, previously issued to [a] sole officer and director" and the one million shares distributed to the friends and acquaintances of the KYUS Shell Sellers. (*Id.* ¶ 52.)

On or about October 15, 2007, New York attorney Adam S. Gottbetter "arranged the purchase of the . . . shell from the KYUS Shell Sellers for $760,000." (*Id.* ¶ 53.) The money was contributed by Defendant, Taxon, Cohen, and Gottbetter's business partner, Sam DelPresto. (*Id.*) Following a merger, KYUS effected a 12:1 stock split. (*Id.* ¶ 55.) As a result of the stock split, Defendant, Taxon, Cohen, Gottbetter, and DelPresto controlled "approximately 12 million purportedly unrestricted shares." (*Id.*)

In or around the summer of 2007, Gottbetter and DelPresto invited Defendant to participate in the KYUS "deal." (*Id.* ¶ 57.) Defendant was to (1) "create an attractive price and volume history by means of manipulative trading"; (2) "distribute a promotional mailer touting the stock"; and (3) "fund the promotional mailer with proceeds from selling KYUS stock on the open market." (*Id.*) To facilitate the scheme, Gottbetter "arrange[d] for [Defendant] to obtain control of a substantial

7

block of purportedly unrestricted KYUS stock." (*Id.*) Defendant subsequently recruited Taxon and Cohen to assist him. (*Id.* ¶ 58.) Unlike the RVNG Owners, Gottbetter "insisted that [Defendant] and his partners purchase KYUS stock in private transactions for $604,000." (*Id.*) Taxon and Cohen sent $300,000 to Defendant who, in turn, contributed an additional $304,000 and sent the entire amount as payment to Gottbetter in return for "seventy-five percent of the purportedly unrestricted shares that were transferred to Gottbetter and DelPresto." (*Id.*) Much like with the RVNG scheme, these shares were placed into different accounts to obscure the connection Defendant, Taxon, and Cohen had to KYUS. (*Id.* ¶ 59.)

Like the RVNG scheme, the KYUS scheme involved a promotional campaign and manipulative trading. (*Id.* ¶ 60.) As a result, "on many days between late 2007 and May 2008, most and sometimes all of the market activity in the [KYUS] stock was generated by accounts" controlled by Defendant, Taxon, or Cohen. (*Id.* ¶ 61.) Defendant also offered to give acquaintances who purchased KYUS stock a "heads-up" about upcoming promotions, allowing the acquaintance to sell the stock at a profit. (*Id.* ¶ 62.) These sales generated cash that Defendant used for the KYUS promotional campaign and also created the false impression of market activity. (*Id.* ¶ 63.)

In or about May 2008, Defendant "distributed by mail a glossy promotional mailer" that "took the form of an eight-page newsletter distributed under the fake name Global Investor Watch" (the "KYUS Mailer"). (*Id.* ¶ 64.) The KYUS Mailer touted KYUS's recent stock price history and falsely claimed it "had been funded by a $2.4 million payment from a fictional entity" when, in reality, Defendant funded the KYUS Mailer with the proceed from selling his KYUS stock. (*Id.*) As a result of the KYUS scheme, KYUS's stock price and the volume of trading "increased dramatically." (*Id.* ¶ 66.) In or around the end of May 2008, Defendant, Taxon, and Cohen had generated approximately $10 million in gross proceeds. (*Id.* ¶ 67.)

### 3.    Subsequent Legal Actions Against Defendant and Others

On or about June 25, 2010, the United States Attorney's Office for the District of New Jersey ("USAO") filed a criminal complaint against Defendant charging him with conspiracy to commit wire fraud. (*Id.* ¶ 71.) The USAO and Defendant subsequently entered a cooperation agreement, under which the criminal complaint was dismissed without prejudice. (*Id.*) The relationship between the parties ultimately deteriorated and, on March 23, 2016, a Grand Jury returned an indictment against Defendant. (*Id.* ¶ 72.)[4] On January 30, 2017, the indictment against Defendant was dismissed on statute of limitations grounds. (*Id.*)

On May 27, 2015, Cohen pleaded guilty to conspiring to commit securities fraud.[5] On May 28, 2015, Taxon pleaded guilty to conspiring to commit securities fraud.[6] Gottbetter ultimately pleaded guilty to conspiring to commit securities fraud and mail fraud relating to different, but highly similar trading schemes.[7]

### 4.    Defendant's Subsequent Actions and Denial of Wrongdoing[8]

The SEC alleges that if an injunction is not granted, Defendant "is likely to engage in further violations of securities laws." (*Id.* ¶ 79.) Since the dismissal of criminal charges, Defendant

---

[4] *United States v. Gentile*, Crim. No. 16-155 (D.N.J.).

[5] *United States v. Cohen*, Crim. No. 15-248 (D.N.J.).

[6] *United States v. Taxon*, Crim. No. 15-249 (D.N.J.).

[7] *United States v. Gottbetter*, Crim. No. 14-467 (D.N.J.).

[8] On February 8, 2019, Defendant filed a civil complaint against the SEC, captioned *Gentile v. Securities and Exchange Commission*, Civil No. 19-5155. (*See* ECF No. 1 in Civil No. 19-5155.) On May 14, 2019, Judge Linares granted the SEC's motion to dismiss, finding that the suit was barred by the doctrine of sovereign immunity. (ECF No. 20 in Civil No. 19-5155.) Defendant appealed and on September 10, 2020, the judgment was affirmed by the Third Circuit. *Gentile v. Sec. & Exch. Comm'n*, No. 19-2252, 2020 WL 5416297 (3d Cir. Sept. 10, 2020).

"has consistently and publicly denied any wrongdoing" in connection with the RVNG and KYUS schemes. (*Id.* ¶ 80.) In an interview with *Bloomberg Businessweek*, Defendant stated he had done nothing wrong and characterized the SEC's investigation as a "witch hunt." (*Id.*) Defendant further stated on his Instagram feed that he "never scammed anyone!" (*Id.*) The SEC alleges Defendant "has not offered any assurance that he will not violate securities laws in the future" and that he "maintains an active presence in the securities industry as the beneficial owner of a Commission-registered broker-dealer and the CEO of a Bahamas-based online brokerage firm." (*Id.* ¶ 82.) The SEC further alleges that "[i]n recent public statements, [Defendant] has committed to expanding his securities industry business" and that his "ongoing involvement in the securities industry will present him with daily opportunities to violate the securities laws again." (*Id.*) The SEC also claims that Defendant "has demonstrated contempt for securities regulators" and notes that when Defendant learned of the SEC's plan to pursue action against him, Defendant "wrote to the [SEC] staff threatening that if the [SEC] pressed its claims against him, he would make sure that the staff would not be able to practice law again." (*Id.* ¶ 83.)

### B.    Procedural History

On March 23, 2016, the SEC filed its initial five-count Complaint against Defendant. (ECF No. 1.) On May 13, 2016, the Honorable Jose L. Linares, U.S.D.J. (ret.), entered an order staying the matter "pending the entry of a judgment in the Parallel Criminal Proceeding." (ECF No. 8.) On March 6, 2017, counsel for the SEC e-filed correspondence informing the Court that, because the indictment in the criminal proceeding had been dismissed, it was appropriate to rescind the order staying this case. (ECF No. 9.) After a series of conferences between the parties, on June 30, 2017, Defendant moved to dismiss the Complaint. (ECF No. 34.) The SEC opposed Defendant's motion (ECF No. 38), Defendant replied (ECF No. 39), and the SEC filed a sur-reply

(ECF No. 42). On September 18, 2017, the Court administratively terminated Defendant's first motion to dismiss and ordered the SEC to file an amended complaint. (ECF No. 46.) On October 6, 2017, the SEC filed an Amended Complaint. (ECF No. 47.) The SEC's Amended Complaint alleges five counts against Defendant: Count One, for violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a) & (c) (*id.* ¶¶ 86–88); Count Two, for violations of Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b) (*id.* ¶¶ 89–91); Count Three, for violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (*id.* ¶¶ 92–94); Count Four, for violations of Section 10(b) of the Securities Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 of the Exchange Act, 17 C.F.R. § 240.10b-5 (*id.* ¶¶ 95–97); and Count Five, for aiding and abetting violations of Section 10(b) and Rule 10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e) (*id.* ¶¶ 98–100). The Amended Complaint seeks two equitable remedies. (*Id.* at 25–26.) First, the SEC seeks an "obey-the-law" injunction, where the Court would enter an order:

> [p]ermanently restraining and enjoining [Defendant], his agents, servants, employees, attorneys[,] and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violation Sections 5(a), 5(c), 17(a)[,] and 17(c) of the Securities Act . . . and Section 10(b) of the Exchange Act . . . and Rule 10b-5 thereunder . . . .

(*Id.*) Second, the SEC seeks a "penny stock bar" injunction, where the Court would enter an order "[p]ermanently prohibiting [Defendant] from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act . . . and Section 21(d)(6) of the Exchange Act." (*Id.* at 26.)

On October 27, 2017, Defendant moved to dismiss the Amended Complaint (ECF No. 50), the SEC opposed (ECF No. 54), and Defendant replied (ECF No. 55.) On December 13, 2017, Judge Linares filed an Opinion and Order granting Defendant's motion to dismiss and directing the Clerk of the Court to close this matter (the "District Court Opinion"). (ECF Nos. 56, 57.) On

February 2, 2018, the SEC filed a Notice of Appeal. (ECF No. 58.) On September 26, 2019, the U.S. Court of Appeals for the Third Circuit issued a judgment vacating the District Court Opinion and remanding the case to the District of New Jersey for proceedings consistent with the Third Circuit's Opinion. (ECF No. 60.) On November 22, 2019, the mandate from the Third Circuit was docketed. (ECF No. 61.)

On December 4, 2019, the Honorable Chief Judge Freda L. Wolfson, U.S.D.J., reassigned this case to the Honorable John Michael Vasquez, U.S.D.J. (ECF No. 62.) On December 17, 2019, Judge Vasquez ordered this matter reinstated to the Court's active docket. (ECF No. 66.) On January 25, 2020, Chief Judge Wolfson reassigned this case to the Undersigned. (ECF No. 75.) On February 14, 2020, Defendant filed the present Motion to Dismiss. (ECF No. 81.) The SEC opposed Defendant's Motion (ECF No. 84), and Defendant replied (ECF No. 89).

## II.   LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

### III.   DECISION

#### A.   The District Court Opinion

Under federal law, "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. Judge Linares highlighted in the District Court Opinion that "[t]he parties all agree . . . that Defendant's allegedly illegal conduct ended in the June of 2008." (ECF No. 56 at 4.) However, the SEC did not file suit against Defendant until March 2016. (ECF No. 1.) Because § 2462 imposes a 5-year statute of limitations, Judge Linares found that whether the SEC's requested relief was penal in nature, and therefore subject to that statute of limitations, was a threshold issue for the Court to address. (ECF No. 56 at 4.) In his analysis, Judge Linares noted that "[c]ourts throughout the country have consistently held that a remedy, including an injunction, is penal in nature which it serves no retributive or remedial purpose and merely seeks to punish an individual." (*Id.*) Judge Linares found that both injunctions requested by the SEC were penal in nature because "there would be no retributive effect" if they were imposed. (*Id.* at 7.) Judge Linares, accordingly, found the SEC's claims were barred by the applicable statute of limitations and granted Defendant's motion to dismiss. (*Id.* at 8.)

#### B.   The Third Circuit Opinion[9]

On September 26, 2019, the Third Circuit vacated the District Court Opinion and held, as a matter of first impression, that properly issued and valid SEC injunctions are not penalties and, therefore, are not governed by the five-year statute of limitations contained in 28 U.S.C. § 2462. *Gentile*, 939 F.3d at 552. The court began its analysis by first considering the nature of the relief

---

[9] *See Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549 (3d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 823 (Apr. 20, 2020). Although the Third Circuit's Opinion is included on the Court's docket at ECF No. 61-2, the Court, for clarity, refers to the citations as they appear in the Federal Reporter.

sought by the SEC.[10] As to the "obey-the-law" injunction, the Third Circuit noted that § 78u(d)(1) of the Exchange Act affords the SEC the "general authority to seek injunctions against ongoing or threatened violations," and, therefore, it was properly characterized as an injunction. *Id.* at 554. As to the "penny stock bar," the court held that while the relevant section does not specifically use the word "enjoin," the text of the statute and its structure necessitated the conclusion that it, too, is injunctive in nature. *Id.* at 555. The relevant issue before the court, therefore, was whether these remedies, when properly issued and framed, "can be penalties subject to the statute of limitations." *Id.*

The Third Circuit rejected Gentile's argument that all SEC injunctions are penalties, and found his argument ran counter to the core tenets of equity jurisprudence because the "injunction process was designed to deter, not to punish." *Id.* at 556. The court found "a properly issued and framed injunction is 'fairly' [said to be remedial], because its sole function . . . is to forestall future violations." *Id.* (internal quotation omitted) (citation omitted). Indeed, "injunctions may properly issue only to prevent harm—not to punish the defendant." *Id.* In analyzing the Congressional intent behind the relevant statutory sections, the court found that "[n]othing in either provision . . . suggests Congress meant to depart from the rule that injunctions are issued to prevent harm rather than to punish past wrongdoing. Neither provision mentions retribution or general deterrence." *Id.* at 557. Moreover, the court found that "[a]bsent much clearer language than is found in the [Exchange Act], the entitlement of a plaintiff to an injunction thereunder remains subject to principles of equitable discretion." *Id.* at 557–58 (quoting *SEC v. Tex. Gulf Sulphur Co.*,

---

[10] The Third Circuit noted that "[t]he [SEC] has parallel injunction and penny-stock bar authority under the Securities Act. . . . Those provisions are materially indistinguishable from the Exchange Act provisions we set forth below, and our analysis applies equally to them." *Gentile*, 939 F.3d at 554 n.4.

401 F.2d 833, 868–69 (2d Cir. 1968) (en banc) (Friendly, J., concurring) (alteration in original). The Third Circuit further held:

> Injunctions may not be supported by the desire to punish the defendant or deter others, so courts abuse their discretion when they issue or broaden injunctions for those reasons. We therefore hold SEC injunctions that are properly issued and valid in scope are not penalties and thus are not governed by § 2462. If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion—not held time barred by § 2462.

*Id.* at 562.

The Third Circuit then addressed the Supreme Court's ruling in *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1640 (2017), where the Supreme Court held SEC disgorgement can be a penalty. The Third Circuit posited, "[i]f SEC disgorgement is both an equitable remedy and a § 2462 penalty, could an injunction be both too?" before answering the question in the negative. *Gentile*, 939 F.3d at 562. The Third Circuit distinguished § 78u(d)(1) and (6) injunctions from SEC disgorgement, noting that the latter is not authorized by statute and highlighting that "at the *Kokesh* oral argument several Justices expressed frustration that the lack of statutory text made it hard to define SEC disgorgement." *Id.* (citation omitted). The Third Circuit further stated that, "notwithstanding what *Kokesh* might suggest about equitable relief in general, we do not believe it opens the door to punitive injunctions." *Id.* The Third Circuit noted that the Supreme Court expressed "skepticism that SEC disgorgement is applied in conformity with traditional equitable principles," and concluded that properly issued injunctions "do not fall within the definition of penalties as defined in *Kokesh*." *Id.* at 563.

The Third Circuit ultimately concluded that, "[b]ecause properly issued and framed injunctions under § 78u(d)(1) and (6) are not penalties governed by § 2462, we will vacate the District Court's judgment and remand for proceedings consistent with this opinion." *Id.* at 566. In

remanding the matter back to the District Court, the Third Circuit wrote:

> We stress that the District Court, on remand, should not rubber-stamp the Commission's request for an obey-the-law injunction simply because it has been historically permitted to do so by various courts. . . . If the District Court, after weighing the facts and circumstances of this case as alleged or otherwise, concludes that the obey-the-law injunction sought here serves no preventive purpose, or is not carefully tailored to enjoin only that conduct necessary to prevent a future harm, then it should, and must, reject the Commission's request. We note that the District Court has already addressed some of the relevant concerns involved in its opinion. We are also troubled by the fact that the Commission appears to seek two injunctions that attempt to achieve the same result.

*Id.* at 565. The Third Circuit further stated that "we conclude by repeating Judge Friendly's warning: an SEC injunction often is much more than [a] 'mild prophylactic.' When the Commission seeks an injunction, the famous admonitions in *Hecht* must never be forgotten." *Id.* at 566 (internal quotations and citations omitted).

### C.     The Parties' Positions

#### 1.     Defendant's Position

Defendant contends there are multiple bases upon which this Court should dismiss the Amended Complaint and argues "the SEC has [pleaded] itself out of court by failing to allege facts that could permit this Court to 'properly fashion' any injunction against [Defendant] for conduct alleged to have occurred thirteen years ago." (ECF No. 81-1 at 1–2.) As to the Third Circuit's Opinion, Defendant states that although former the District Court Opinion was vacated, the court "was careful not to reverse it" and instead "provid[ed] a roadmap for dismissing this case on other more proper grounds." (*Id.* at 2.) Defendant urges the Court to dismiss the Amended Complaint now "as a matter of its equitable discretion" instead of "waiting to announce this unavoidable

conclusion at the end of lengthy discovery (on irrelevant matters) and trial (for which there can be no finding of a substantive securities violation)." (*Id.* at 3.)

First, Defendant argues that Plaintiff cannot obtain a declaration that Defendant engaged in a substantive securities law violation because the alleged conduct occurred more than five years in the past. (*Id.* at 11.) The Amended Complaint does not allege a violation of substantive securities law occurring after 2008, and such claims are subject to a five-year statute of limitations. (*Id.* at 11–12.) Plaintiff contends that to properly fashion an injunction, the Court "must find and declare [Defendant] is liable for a substantive securities violation." (*Id.* at 13.) Because it cannot, Defendant contends an injunction is inappropriate. (*Id.*)

Second, Defendant argues that, because the Amended Complaint fails to allege he "engaged [in or is] about to engage in" a securities law violation, an injunction under §§ 78u(d)(1) and (6) cannot issue. (*Id.*) Third, Plaintiff contends that *Bonastia*, 614 F.2d 908 (3d Cir. 1980), creates a two-part test for courts to use when determining whether to issue an injunction. (*Id.* at 15.) Plaintiff asserts courts: (1) ask whether a substantive securities violation has occurred and (2) if so, ask if there is a reasonable likelihood the defendant will again engage in the illegal conduct. (*Id.* (citations and quotations omitted).) Plaintiff argues that, "[b]ecause any finding or declaration of liability based on allegations of a securities law violation from 2007 and 2008 would be punitive and therefore time-barred in this case," the SEC is unable to establish the first prong of *Bonastia* and the Amended Complaint should be dismissed either for failure to state a claim or in the Court's equitable discretion. (*Id.* at 15–16.) Finally, Plaintiff urges the Court to exercise its equitable discretion and dismiss the Amended Complaint because the SEC has failed to sufficiently allege an actual risk of future harm. (*Id.* at 19.)

On reply, Defendant disputes his Motion is procedurally barred, noting that because Judge Linares ruled on statute of limitations grounds, the merits of his Motion have never been evaluated by the Court. (ECF No. 89 at 4.) Defendant further contends his Motion "is entirely premised on the new law set forth by the Third Circuit in this case or re-arguing points never substantially considered or ruled on" by this Court. (*Id.* at 5.) Defendant similarly argues he has not waived any arguments put forth in his Motion because he in fact had previously raised them, but they were evaluated by Judge Linares or the Third Circuit. (*Id.* at 7.) Defendant also counters Plaintiff's assertion that it is premature to consider many of his arguments, stating that "this proclamation finds no support in case law." (*Id.* at 11.) Finally, Defendant argues it would be inappropriate for the Court to consider the facts proffered by Plaintiff in its opposition brief because such facts are not contained within the Amended Complaint. (*Id.* at 12.) Defendant similarly argues it would be inappropriate for the Court to take judicial notice of these facts because such facts are "disputed and unreliable." (*Id.* at 13–14.)

## 2.      The SEC's Position

First, the SEC points the Court to "more recent judicially-noticeable facts relevant to injunctive relief" it believes the Court should consider when deciding the present Motion. (ECF No. 84 at 7–8.) Next the SEC argues, as a threshold matter, the Court should deny Defendant's Motion pursuant to Federal Rule of Civil Procedure 12(g)(2)[11] because it "violates [the Rule's] proscription against serial motions to dismiss on grounds previously available." (*Id.* at 9–10.) The SEC contends the Motion merely "rehashes arguments [Defendant] already lost before the Third Circuit or asserts grounds he could have asserted—but chose not to—on his earlier motion and on

---

[11] All references to a "Rule" or "Rules" refer to the Federal Rules of Civil Procedure, unless otherwise noted.

appeal and are thus barred under the law of the case doctrine." (*Id.* at 10.) The SEC notes Defendant "could simply repackage these same arguments in a post-answer Rule 12(c) motion" and that "forcing him to do so by denying his improper motion [to dismiss] does not impede judicial economy." (*Id.* at 11.) The SEC argues judicial economy would be best served by requiring Defendant to proceed by way of a Rule 12(c) motion because "[Defendant's] answer may well narrow the need for discovery of many of the [Amended] Complaint's factual allegations." (*Id.*) The SEC further notes that "[g]ranting [Defendant's M]otion, by contrast, could require another appeal to the Third Circuit, further and unnecessarily delaying to proceedings." (*Id.*)

The SEC also argues that Defendant's arguments are substantively meritless. (*Id.* at 15.) First, the SEC contends that declaratory judgments are not prerequisites to injunctive relief. (*Id.* at 16.) The SEC concedes, however, that "[w]here a defendant appears in a case and does not consent to an injunction, as here, however, a finding of liability is a prerequisite before a court may consider the relevant factors in fashioning appropriate injunctive relief, if any." (*Id.* (citing *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 295 (3d Cir. 2013).) But, the SEC argues that such a finding "may be made, for example, by the Court on summary judgment or after a bench trial or by the jury after a jury trial." (*Id.* at 16–17 (citations omitted).)

To that end, the SEC asserts that this Court should not consider, at the pleading stage, whether the injunctions are proper or whether "too much time has elapsed to support the entry of injunctions as an equitable matter." (*Id.* at 18.) The SEC argues that because they are not required to plead around affirmative defenses in a complaint, and because "a determination of liability is a prerequisite to the entry of an injunction where a defendant has appeared and contests the case[,]" the necessary implication is that the proper time to determine the propriety of an injunction is after liability has been established. (*Id.*) The SEC highlights the Supreme Court has held the SEC "must

establish a sufficient evidentiary predicate to show that such a future violation may occur," *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 701 (1980), and that the Third Circuit stated that courts "should make this determination on a developed record," *Gentile*, 939 F.3d at 564. (*Id.*) The SEC contends such an analysis cannot be conducted at the pleading stage. (*Id.*)

Additionally, the SEC argues that the cessation of illegal activity, which Defendant contends supports denial of an injunction, is but one factor a court can consider and is not dispositive. (*Id.* at 19.) The Commission again argues it is premature to determine "whether [Defendant's] assurances of lack of violations in intervening years—during some of which he was under FBI supervision and none of which the Commission has examined—is a proper basis to decide whether to issue an injunction." (*Id.*) The SEC concludes that, "[a]t a minimum, the Amended Complaint alleges facts that support the need for an injunction" at this stage. (*Id.* at 20.)

### D. Defendant's Motion to Dismiss is Not Procedurally Barred by Rule 12(g) Or By the Law of the Case Doctrine

The SEC argues the Court should deny Defendant's Motion pursuant to Rule 12(g)(2) because it "violates [the Rule's] proscription against serial motions to dismiss on grounds previously available." (ECF No. 84 at 9–10.) The Court finds this argument meritless.

Rule 12(g)(2) provides, in relevant part, "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." "While the Third Circuit has strictly construed Federal Rule of Civil Procedure 12(g)(2) to impose restrictions on the filing of successive motions to dismiss, it applies only to bar defenses and objections that were 'available' to the moving party at the time of the motion." *Allen v. N.J. State Police*, No. 16-1660, 2017 WL 5714707, at *4 (D.N.J. Nov. 28, 2017) (citing *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) ("Except as provided in rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make

another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion."). However, the Rule "does not preclude the filing of a second motion pursuant to Rule 12 where the defense or objection was not available at the time of the filing of the initial motion." *Jewett v. IDT Corp.*, No. 04-1454, 2008 WL 508486, at *2 (D.N.J. Feb. 20, 2008). Furthermore, "[w]hile a technical reading of the rules appears to prevent defendants from filing successive pre-answer motions to dismiss, many courts have interpreted these rules permissively and have accepted subsequent motions on discretionary grounds." *Brown v. City of Essex Cty. N.J.*, No. 10-3980, 2011 WL 3610268, at *3 (D.N.J. Aug. 16, 2011) (internal quotation omitted) (citation omitted). "Additionally, allowing a subsequent motion to dismiss for failure to state a claim can provide efficiency benefits, as it prevents unnecessary delay in the proceedings." *Id.*

Here, the Third Circuit vacated the District Court Opinion and remanded the matter to this Court for further analysis consistent with the Third Circuit's judgment. As discussed in its decision, the Third Circuit addressed the issue as a matter of first impression and, in so doing, created new binding precedent upon this Court and other courts within this Circuit. The Court, therefore, is skeptical that the defense and objections contained within Defendant's Motion were truly available to him when his first motion was filed. Moreover, the decision in the District Court Opinion was premised on statute of limitations grounds and did not address the substantive merits of the parties' arguments. The parties' substantive arguments, therefore, are only now truly before the Court for the first time. The Court finds that judicial efficiency is indeed best served by consideration of Defendant's Motion, rather than further prolonging the proceedings with an Answer and likely subsequent Rule 12(c) motion. Once more, the SEC acknowledges that "[Defendant] could simply repackage these same arguments in a post-answer Rule 12(c) motion

for judgment on the pleadings." (ECF No. 84 at 11.) The SEC's argument that "forcing [Defendant] to [file a Rule 12(c) motion] by denying his improper motion to dismiss does not impede judicial economy." (*Id.*) The Court disagrees. To the extent an exercise of discretion is required, the Court chooses to do so and will consider Plaintiff's Motion.

The SEC's argument that the law of the case doctrine precludes Defendant's arguments is similarly unpersuasive. "Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988)). However, a court "may reconsider issues that we previously resolved if any of the following 'extraordinary circumstances' are present: (1) there has been an intervening change in the law; (2) new evidence has become available; or (3) reconsideration is necessary to prevent clear error or a manifest injustice." *Id.* at 188 (citation omitted) (internal quotation marks omitted). The SEC argues that no extraordinary circumstances are present here, but such an argument is entirely contravened by the vacation of the District Court Opinion. Moreover, as discussed above, the merits of the parties' arguments were never evaluated. To preclude the consideration of Defendant's Motion would be to deny him the right to have his arguments heard by the Court. The Court declines to endorse such a system.

### E.   The Court Declines to Take Judicial Notice of Factual Allegations Not Included in the Amended Complaint

The SEC urges the Court to take judicial notice of certain facts that it argues are "relevant to injunctive relief." (ECF No. 84 at 7.) These alleged facts include representations made by Defendants regarding his participation in the securities industry in the Bahamas, a temporary suspension order issued against Defendant's firm in the Bahamas by the Securities Commission of the Bahamas, Defendant's attempt to organize and operate an "international financial entity" in

Puerto Rico. (*Id.* at 7–8.) The SEC cites to the Declaration of Nancy A. Brown to support their contentions. (ECF No. 85.)

"[A]s a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6)." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). It is also "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) (citation omitted); *Bolden v. Nat'l Fin. Servs. LLC*, No. 04-5527, 2005 WL 8175134, at *6 (D.N.J. May 23, 2005) (noting that a plaintiff "cannot rely on new facts not alleged in their Complaint to defeat a motion to dismiss"). However, Federal Rule of Evidence 201(b) "permits a district court to take judicial notice of facts that are not subject to reasonable dispute in that they are either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 390 (D.N.J. 2010) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002)) (alterations omitted). "Conversely, judicial notice is improper if a legitimate question exists as to the underlying source of the information." *Id.*

Setting aside the propriety of exercising judicial notice in this specific circumstance, the Court is compelled to highlight that this is not the first time the SEC has attempted to rely on factual assertions not contained in the operative complaint. In a September 18, 2017 Opinion and Order, Judge Linares administratively terminated Defendant's motion to dismiss the original complaint and directed the SEC to file an amended complaint. (ECF No. 46.) In so doing, the Judge Linares noted that "in its opposition brief, the SEC raises examples concerning certain conduct that [Defendant] has engaged in after January 2017 that are not asserted in the complaint."

(ECF No. 46 ¶ 6.) "Thus the SEC seeks to proceed in this case based upon claims and factual allegations that . . . are not asserted in the complaint, and are being raised for the first time in response to the motion to dismiss." (*Id.* ¶ 7.) "As a result, the Court is being asked to engage in the task of addressing a . . . [Rule 12(b)(6) Motion], but the Court does not have the benefit of a straightforward complaint to refer to in determining whether a claim has been stated." (*Id.* ¶ 8.)

The SEC appears to be, once again, raising examples of the Defendant's conduct not contained in the Amended Complaint. Such an effort was not previously permitted by the Court, nor will it be permitted now. The Court, accordingly, declines to take judicial notice of the new facts alleged in the SEC's opposition brief. If the SEC wishes the Court to consider these allegations, they must be included in a further amended complaint.

### F.    The Amended Complaint Fails to State a Plausible Claim for Relief

The Amended Complaint seeks two equitable remedies. (ECF No. 47 at 25–26.) First, the SEC seeks an "obey-the-law" injunction, where the Court would enter an order:

> [p]ermanently restraining and enjoining [Defendant], his agents, servants, employees, attorneys[,] and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violation Sections 5(a), 5(c), 17(a)[,] and 17(c) of the Securities Act . . . and Section 10(b) of the Exchange Act . . . and Rule 10b-5 thereunder . . . .

(*Id.*) Second, the SEC seeks a "penny stock bar" injunction, where the Court would enter an order "[p]ermanently prohibiting [Defendant] from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act . . . and Section 21(d)(6) of the Exchange Act." (*Id.* at 26.)

"Both remedies are found in 15 U.S.C. § 78u(d)." *Gentile*, 939 F.3d at 554. The Third Circuit also noted that "[t]he [SEC] has parallel injunction and penny-stock bar authority under the Securities Act. *See* 15 U.S.C. § 77t(b), (g). Those provisions are materially indistinguishable from the Exchange Act provisions we set forth below, and our analysis applies equally to them."

*Id.* at 554 n.4. In its directive, the Third Circuit stated that it would "remand the case for the District Court to decide whether the injunctions sought are permitted under § 78u(d)." *Id.* at 552.

The SEC's general authority to seek injunctive relief is found in 15 U.S.C. § 78u(d)(1), which states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations thereunder . . . it may in its discretion bring an action in [district court] to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

"Section 78u(d)(1) injunctions that simply reference or restate the text of statutory prohibitions are called 'obey-the-law' injunctions." *Gentile*, 939 F.3d at 554. The SEC's authority to seek a "penny-stock bar" appears in 15 U.S.C. § 78u(d)(6)(A), which states:

> In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

"[T]he Supreme Court said of SEC injunctions that 'the proper exercise of equitable discretion is necessary to ensure a 'nice adjustment and reconciliation between the public interest and private needs.'" *Gentile*, 939 F.3d at 559 (quoting *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 701 (1980)). "In cases where the Commission is seeking to enjoin a person about to engage in any acts or practices which . . . will constitute a violation of those provisions, the Commission must establish a sufficient evidentiary predicate to show that such future violation may occur." *Aaron*, 446 U.S. at 701 (internal quotation marks omitted) (alteration in original); *see also Bonastia*, 614 F.2d at 912 ("The well[-]established standard developed by the courts to determine if an injunction should issue in a case involving securities violations reflects these purposes and is

26

based on a determination of whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct."); *see also Gentile*, 939 F.3d at 540 ("That an injunction is permissible only where necessary to prevent . . . misconduct from occurring in the future and not merely to punish past transgressions . . . is a standard to which the SEC must also hold itself. When it does not, the buck stops here: Lest we return to those days when only a modest showing was considered sufficient . . . federal courts may not grant SEC injunctions except upon a proper showing of the likelihood of future harm.") (internal quotations and citations omitted) (first alteration in original).

In the Third Circuit, this determination is based on "factors including not merely the fact of a past violation but more importantly 'the degree of scienter involved [in the past violation], the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, [and] the sincerity of his assurances against future violations.'" *Id.* at 559 (quoting *Bonastia*, 614 F.2d at 912) (alterations in original). "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." *Bonastia*, 614 F.2d at 912 (citations omitted). "[I]in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *Gentile*, 939 F.3d at 559 (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972)). "Those considerations include not only the need to protect the public where the circumstances of the offense and of the offender give rise to a substantial risk of future harm . . . but also the stigma, humiliation, and loss of livelihood attendant to the imposition of the two injunctions sought here, whether temporary or permanent." *Id.* (internal citation omitted).

Indeed, "the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." *Id.* (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1102).

"[T]he harsh effects of an SEC injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible." *Id.*   "An [SEC] injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith." *Aaron*, 446 U.S. at 703 (Burger, C.J., concurring); *see also Gentile*, 939 F.3d at 566 ("[W]hen a court bans a defendant from his industry, it imposes what in the administrative context has been called the 'securities industry equivalent of capital punishment.'") (quoting *Saad v. S.E.C.*, 718 F.3d 904, 906 (D.C. Cir. 2013).

"A preventive injunction must be justified by a substantial showing of threatened harm, assuring the court that the opprobrium and other collateral consequences that accompany it are outweighed by a demonstrated public need; retribution is not a proper consideration to support this showing." *Gentile*, 939 F.3d at 560 (citing *Hartford-Empire Co. v. United States*, 323 U.S. 386, 433–35 (1945)). "[T]he principle that injunctions may issue only 'to prevent threatened future harm,' not to punish . . . applies equally to an injunction's scope." *Id.* (internal citation omitted). "If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion." *Id.* at 562. "Courts should make this determination on a developed record, *assuming the plaintiff has stated a plausible claim for relief.*" *Id.* at 564 (citations omitted); *see also EME Homer City Generation*, 727 F.3d at 295–96 (affirming dismissal of claims for improper injunctive relief) (emphasis added).

Here, considering the facts alleged in the Amended Complaint, the Court finds the SEC has not stated a plausible claim for relief. The SEC argues the Court cannot make a determination

as to the propriety of the sought injunctions at this stage because it can only make such a decision upon consideration of a developed factual record. While this is an accurate statement of the general standard governing the issuance of injunctions, the SEC omits, or at least fails to acknowledge, that their complaint must still state a plausible claim for relief. Despite accepting the facts alleged as true, and drawing reasonably inferences in the SEC's favor, the Court concludes the SEC has not stated such a claim.

First, as previously acknowledged in the District Court Opinion, the parties agree Defendant's allegedly illegal conduct ceased in June 2008. (*See* ECF No. 56 at 4.) The SEC, therefore, is asking this Court to enter an injunction to prevent future harm against a Defendant who, according to the allegations of the Amended Complaint, has not engaged in illegal securities activity for over a decade. Second, in order to be successful, the SEC must plausibly allege Defendant will engage in future securities violations absent an injunction. The SEC contends Defendant's denial of wrongdoing and rejection of responsibility for his actions support a conclusion that he is likely to violate securities laws in the future. (*See generally* ECF No. 47.) The specific facts alleged by the SEC to support this conclusion, however, are somewhat feeble. In support of their claims, the SEC relies on commends made by Defendant, including an interview where he stated he "did nothing wrong" and characterizing the investigation as a "witch hunt." (*Id.* ¶ 80.) The SEC also alleges Defendant "has not offered any assurance that he will not violate the securities laws in the future." (*Id.* ¶ 81.)[12] In the District Court Opinion, Judge Linares rejected

---

[12] The Amended Complaint also includes allegations relating to Defendant's presence in the securities industry in the Bahamas. (*See* ECF No. 47 ¶ 82.) These allegations seem in conflict with the more recent facts alleged by the SEC in their opposition brief; facts they seek to bring to this Court's attention by way of the exercise judicial notice. Because the Court declines to take judicial notice of these facts, the SEC might be well-served by including them in a further amended complaint.

this contention, noting that:

> Simply alleging that Defendant violated securities laws does not lead the Court to conclude that Plaintiff is likely to violate securities laws in the future. The fact that Defendant boasted about "not scamming anyone" during an interview and made shrewd comments about the [SEC] on social media also does not indicate that Defendant will violate securities laws in the future.

(ECF No. 56 at 7–8.) This Court agrees. Third, the insufficiency of the SEC's allegations is highlighted by a simple hypothetical. If Defendant had merely posted on social media that, although he was innocent of the charges levelled against him, he nonetheless pledged to follow all securities laws in the future, would the SEC consider that contrition and abandon their sought injunctions? Surely they would not. Yet the SEC argues that a single comment made by the Defendant where he said he "did nothing wrong" bolsters their claim for relief. The Court finds such a conclusion to be suspect. Finally, numerous other courts have exercised their equitable discretion and denied injunctive relief where substantial time has elapsed between the alleged securities violation and the sought injunction. *See, e.g.*, *U.S. S.E.C. v. Boey*, No. 07-39, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) (denying the SEC's request for an injunction where "the SEC here has not shown any realistic likelihood that [the defendant] will commit similar violations in the future. Twelve years have passed since [the defendant's] fraudulent conduct, and the SEC does not argue that he has engaged in any additional illegal conduct"); *S.E.C. v. Dibella*, No. 04-1342, 2008 WL 6965807, at *13 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009) ("[T]he passage of nearly 10 years without another violation weighs heavily against an injunction."); *S.E.C. v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) ("[S]everal years have passed since [d]efendants' alleged misconduct apparently without incident. This fact further undercuts the [SEC's] assertion that [d]efendants pose a continuing risk to the public."); *Proffitt v. F.D.I.C.*, 200 F.3d 855, 862 (D.C. Cir. 2000) ("While a serious offense, even long past, may

indicate [defendant's] current risk to the public, that offense cannot alone determine his fitness almost a decade later.").

"Courts should make this determination [regarding the propriety of an injunction] on a developed record, assuming the plaintiff has stated a plausible claim for relief." *Gentile*, 939 F.3d at 564 (citations omitted). While the SEC is not required to make an evidentiary showing to survive a motion to dismiss, they must still include sufficient allegations to plausibly state an entitlement to relief. Here, even with all inferences drawn in the SEC's favor, the allegations of the Amended Complaint are insufficient to state a plausible claim for relief. The Court, accordingly cannot even consider whether to impose the "securities industry equivalent of capital punishment." *Saad*, 718 F.3d at 906. Defendant's Motion to Dismiss is, therefore, **GRANTED**. The Court, however, will permit the SEC one final opportunity to amend their complaint.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED**. An accompanying Order will follow.

Date: September 29, 2020                              *s/ Brian R. Martinotti*
                                                     **HON. BRIAN R. MARTINOTTI**
                                                     **UNITED STATES DISTRICT JUDGE**